CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 18 2022

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:21cr00022-003 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MELODY Z. WEESE, | ) | By:   Hon. Thomas T. Cullen |
| | ) |        United States District Judge |
| Defendant. | ) | |

This matter is before the court on Defendant Melody Weese's Motion to Dismiss the Indictment Based on Prosecutorial Misconduct (ECF No. 154) and her Motion to Compel the Production of *Brady/Giglio* Evidence and to Disqualify Counsel for the Government (ECF No. 136.)[1] For the reasons explained below, the court finds that government counsel did not commit prosecutorial misconduct and that, in any event, his actions did not prejudice Weese. The court will therefore deny both motions.

## I.    BACKGROUND

Because Weese contends that the lead government counsel, Assistant United States Attorney ("AUSA") Daniel Murphy, has engaged in prosecutorial misconduct at nearly every stage of this investigation and prosecution, the court will briefly summarize the evolution of this case, from the government's preindictment investigation to recent pretrial proceedings.

---

[1] Although the *Brady/Giglio* motion is styled as one to compel production of exculpatory and impeachment evidence related to Weese's co-defendant and the government's key cooperating witness—Weese's mother, Pamela Ziglar—Weese obtained the evidence at issue from another source: specifically, her mother's attorney. Accordingly, the motion to compel production is more accurately characterized as Weese's notice of the government's alleged failure to produce exculpatory and impeachment information and a motion for the court to sanction the government by removing the lead prosecuting attorney, Assistant United States Attorney Daniel Murphy, from the case. The court also construes this motion as Weese providing additional grounds to support her general allegation of prosecutorial misconduct by AUSA Murphy, as well as a request to take additional steps to ensure the government's compliance with its obligations under *Brady*, *Giglio*, and their progeny.

### A. Preindictment Interview, Negotiations, and Indictment

In or about late 2020, the government opened an investigation into Weese's parents (and co-defendants), Pamela and Kenneth Ziglar ("the Ziglars"). The government suspected that the Ziglars, who worked in the vehicle transport industry, had obtained various forms of federally funded COVID-19 monetary relief to which they were not entitled—including extended unemployment benefits, paycheck protection advances, and small business loans—by making false representations about the nature, scope, and size of their business. (*See* ECF No. 1.) For example, the government alleges that the Ziglars falsely claimed on loan applications that they owned a company known as Five Z's Auto Transport ("Five Z's") that employed three people, including both Pamela and Kenneth Ziglar, when in fact Kenneth was the sole operator of a vehicle transport truck and was, at the time of the application, employed as a subcontracted driver for another company. (*See id.*) Since Five Z's did not operate as a vehicle transport business during the relevant period (or employ three people at any point), the government contends that the Ziglars were not entitled to the $212,945 in federal aid that they received.

As part of the government's investigation into the alleged fraud, federal and local investigators interviewed the Ziglars at their residence in Henry County, Virginia, on April 29, 2021. AUSA Murphy accompanied two special agents from the Federal Deposit Insurance Corporation's Office of Inspector General ("FDIC-OIG") and a local sheriff's deputy to the Ziglars' home. This interview was the first time that government investigators had any direct contact with the Ziglars and, at that time, the Ziglars were not represented by counsel. The audio recording of the interview indicates that the Ziglars invited the four men into their home

and verbally consented to participating in the interview.[2] (*See generally* Interview Tr., Apr. 29, 2021 [ECF No. 86-1] ("Home Tr.").)

At the outset of the interview, the lead FDIC-OIG investigator, Special Agent ("SA") Mike Serra, identified all the government participants: himself; his partner, fellow FDIC-OIG SA Mike Rexrode; AUSA Murphy, whom he described as "Daniel Murphy from the U.S. Attorney's Office"; and the local Sheriff's deputy. (Home Tr. at 3.) SA Serra then reiterated, apparently referencing the agents' initial conversations with the Ziglars, that the ensuing interview would be "entirely voluntary" and that no one is "under arrest." (*Id.*) SA Serra asked the Ziglars if they were comfortable proceeding, and they both said that they were. (*Id.*) SA Serra then informed the Ziglars that the investigators were "sort of looking into" the paycheck protection advances and other COVID-19-relief benefits that the Ziglars had applied for and received. (*Id.* at 4.) For the next nearly two hours, the Ziglars answered the investigators' detailed questions about Kenneth Ziglar's employment history, the provenance and current status of Five Z's, the Ziglars' applications for COVID-19 relief benefits in the business's name, and various financial transactions involving the government funds intended for Five Z's.

Although the investigators' questions focused on the Ziglars, their business, and the government benefits they had received, they asked several questions about the Ziglars' adult daughter, Melody Weese, then a Carter Bank and Trust employee who, according to banking records, was a signatory on the Five Z's business bank account. The agents also had records from that account showing that Pamela Ziglar had written a $5,000 check to Weese, listing

---

[2] Melody Weese was not present during this interview.

"pay" on the memo line. When the agents identified Melody Weese by name and asked if she was an employee of Five Z's, Pamela Ziglar expressed surprise that they knew her daughter's name. (*See id.* at 26.)

SA Serra then asked a series of questions about the Five Z's bank account and the $5,000 check that had been written to Melody. Pamela Ziglar explained that her daughter, a bank employee, regularly assisted her with various financial matters; it was Melody who had suggested breaking up her intended $15,000 withdrawal from the Five Z's account into three separate $5,000 checks "so that the banking would go through easier instead of throwing up a red flag going, 'hey this couple's getting $15,000' you know, so we just done it like that." (*Id.* at 45.) SA Serra, in response, asked Pamela Ziglar if there was any reason to "to be nervous of a red flag . . . ?" (*Id.*) Pamela Ziglar said she told her daughter she wasn't concerned about red flags, but explained to the investigators that Melody was the banker of the family and they had followed her advice. (*Id.* at 46.) When SA Serra later pressed Pamela Ziglar for additional details about the check, Ziglar indicated that she did not want to get her daughter in trouble. (*Id.* at 58.) SA Serra replied that the agents weren't "trying to jam [Melody] up"; they were just trying to understand what role, if any, she had in her parents' business and whether she was paid for her services. (*Id.*) Pamela responded that the check was not for "services provided"— "[i]t was just because [of] bank policy." (*Id.*)

SA Serra conducted most of the interview but, at various points, AUSA Murphy interjected and pressed the Ziglars on a variety of topics. In so doing, AUSA Murphy explained that he was "was just trying to understand the business." (*Id.* at 47.) Later in the interview AUSA Murphy reiterated that sentiment, stating that the Ziglars' responses had been "helpful"

and increased his understanding of "how the business works." (*Id.* at 55.) AUSA Murphy and the government agents were cordial throughout the nearly two-hour interview, even joking about not being good with numbers, buying an old pick-up truck from the family, and staying for dinner.

Once the investigators had finished asking the Ziglars substantive questions, the discussion took a more solemn tone. SA Serra thanked the Ziglars for their time and providing their "side of the story." (*Id.* at 106.) He then turned the meeting over to AUSA Murphy to explain the process "moving forward." (*Id.*) AUSA Murphy then informed the Ziglars that they were "targets" of a federal criminal investigation and handed them letters formally notifying them of this development and the likelihood that they would be charged with crimes. (*Id.* at 106–11.) AUSA Murphy told the Ziglars that, because they had been "gracious" enough to allow the agents into their home for an interview, he would explain what the letters meant and what would happen going forward. He added that he owed the Ziglars "100% candor and transparency in what it is that . . . we're doing here." (*Id.* at 106.) After expressing shock, Pamela Ziglar asked AUSA Murphy if this meant that the investigators wanted them to pay the money back, asking if that's "[w]hat it's coming down to"? (*Id.* at 110.) In response, AUSA Murphy stated:

> Ma'am, again, I told you. I owe you transparency and candor, okay? What I do within the Department of Justice is that I am a criminal prosecutor, okay? And so, to be a, a target of an investigation, means that you are being investigated for criminal activity, okay? I understand, I understand as you, as you look at me, you, y, y, y. You don't know exactly, and I, and I don't, this is why I believe it would be prudent for you to, to, to contact an attorney, and have an attorney reach out to me.

(*Id.* at 110–11.) Pamela Ziglar, maintaining an incredulous tone, asked several more questions about the target letter and the various criminal charges listed on it. AUSA Murphy and the agents deflected these questions, reiterating that they could not give the Ziglars legal advice and that the Ziglars should retain an attorney. Shortly thereafter, the agents left the Ziglars' home.

Following that interview, the Ziglars retained counsel, and their attorneys contacted AUSA Murphy. Over the next few months, the Ziglars' lawyers and AUSA Murphy discussed—both in person and over email—possible criminal charges, the government's evidence, and a possible preindictment resolution. AUSA Murphy ultimately proposed a plea agreement whereby the Ziglars would each plead guilty under Federal Rule of Criminal Procedure 11(c)(1)(C)[3] to a single count of conspiracy to defraud the United States, with a binding sentencing range of between 0–33 months. AUSA Murphy added that "any plea agreement would be a contingent plea agreement whereby Pamela Ziglar and Kenneth Ziglar agree to plead guilty with the same terms." (ECF No. 164-11, at 28–29.) In other words, the proposed plea agreements were "wired," meaning that both Ziglars had to accept and plead guilty under the government's proposed terms; if one defendant refused, the government would not enter the agreement with the other.

The Ziglars ultimately rejected this proposal and AUSA Murphy informed their attorneys that he would seek an indictment from the grand jury. In late October 2021, the grand jury returned an indictment charging Pamela and Kenneth Ziglar with 13 fraud offenses,

---

[3] Under this provision, the court is obligated to accept the proposed sentence or sentencing range if it accepts the plea agreement negotiated by the parties.

including conspiracy to defraud the United States, conspiracy to commit wire fraud, substantive wire fraud, and aggravated identify theft. (*See* ECF No. 1.) The indictment also charged Melody Weese with two counts of conspiracy stemming from her alleged role in assisting her parents with conducting financial transactions involving the proceeds of fraudulently obtained COVID-19 relief money. (*See id.* ¶¶ 22–23.) Specifically, the indictment alleges that Weese conspired with her parents by: jointly opening the Five Z's business account; receiving and cashing a $5,000 check from that account; and advising her mother "to write . . . checks in amounts below $10,000 to avoid 'red flags' at the bank." (ECF No. 139 ¶ 4.o.) According to SA Serra's summary testimony to the grand jury, the two conspiracy charges against Weese were based on her mother's statements about her during the April 29, 2021 interview, Weese's joint-signatory status on the Five Z's checking account, and the cancelled $5,000 check. (*See generally* Grand Jury Tr., Oct. 25, 2021 [ECF No. 184].) The government never attempted to interview Weese and never sent her a target letter.

### B. Post-Indictment Plea Negotiations

Shortly after the indictment was returned, Weese's attorneys moved to sever her trial from that of her parents based on the likelihood that the government would attempt to introduce her parents' April 29, 2021 statements at their joint trial. (*See* ECF No. 49.) Specifically, Weese argued that the government's introducing her mother's statements about Weese during the April 29 interview at their joint trial would violate her rights under the Confrontation Clause, as explained in *Bruton v. United States*, 391 U.S. 123 (1968), because her mother's statements would be admitted, but she would be unable to cross-examine her mother without running afoul of her mother's constitutional right against self-incrimination. The

government did not oppose the motion, and the court granted Weese's motion to sever. (ECF No. 58.)[4]

Over the next several months, the government proposed a series of so-called "wired" plea agreements to attorneys for Weese and the Ziglars. First, the government proposed that the Ziglars plead guilty under the same terms that had been outlined prior to indictment— pleas to conspiracy counts with a stipulated sentencing range of 0–33 months—while Weese would face a sentencing range of 0–6 months. (*See* ECF Nos. 154-1 & 154-2.) The government's willingness to enter any of these pleas was contingent on each of the three defendants accepting the plea terms proposed to them. After the defendants refused that proposal, the government proposed wired pleas for Pamela Ziglar and Weese. Although the terms for these two defendants were the same as before, this time the government stated that, if Pamela and Weese accepted the proposal, it would move to dismiss the indictment of Kenneth Ziglar. (*See* ECF No. 154-3.) Weese's counsel has represented that Pamela Ziglar was willing to accept this proposal, but Weese was not.

In the meantime, the court convened a status conference with all three defendants and their attorneys on April 29, 2022, to discuss, among other issues, the order of the now-severed criminal trials.[5] As a result of that hearing, the court determined that Weese's trial would proceed first and set it for June 21–23, 2022. Following that hearing, AUSA Murphy proposed a new set of wired plea agreements for Pamela and Kenneth Ziglar. Under this new proposal,

---

[4] Kenneth Ziglar also moved to sever his trial from his wife's based on the same *Bruton* concerns; the court granted that motion. (*See* ECF No. 63.)

[5] It was in the context of scheduling these trials that allegations of prosecutorial misconduct first surfaced. (*See* ECF No. 65.)

Pamela and Kenneth would each plead guilty to two conspiracy counts, but they would face different stipulated sentencing ranges: Pamela, 0–33 months; Kenneth, 0–12 months. The draft plea agreements included a factual stipulation that "Melody Weese joined the conspiracy in an effort to assist Pamela Ziglar and Kenneth Ziglar with obtaining money to which they were not entitled." (*See, e.g.*, ECF No. 154-2, at 5.) The Ziglars rejected these proposals as well. Apparently, Pamela was adamant that her husband had not been a knowing participant in the conspiracy and indicated, through her counsel, that she would not plead guilty if it required her to implicate him in the scheme.

As Weese's trial approached, AUSA Murphy reengaged Pamela Ziglar's attorney about a plea. On May 9, 2022, he responded to an email from her attorney, refusing a counter proposal that would allow Pamela to plead guilty to the conspiracy counts under the previous terms but would not require her to implicate Weese or her husband. (ECF No. 154-5.) AUSA Murphy wrote: "[T]o gain the benefit of a plea agreement that limits her own punitive exposure, [Pamela] has to do *something* for the government." (*Id.*) AUSA Murphy then outlined two possible options that might be acceptable to the government: (1) Pamela pleads guilty to a conspiracy involving her husband and daughter and stipulates to their involvement; or (2) Pamela "admits to having done this entirely on her own with no knowledge on the part of her husband and daughter[,]" in which case she pleads to the conspiracy and the charge of aggravated identity theft, which carries a mandatory two-year prison term. (*Id.*)

### C.  Pamela Ziglar Pleads Guilty

On June 1, 2022, AUSA Murphy formally proposed an "alternative" plea agreement to Pamela Ziglar's counsel. Unlike earlier iterations, this proposal was not "wired" to any other

plea agreement; it was directed only at Pamela Ziglar. The material terms of this proposal called for Pamela to plead guilty to the conspiracy counts and the aggravated identity theft that carries a mandatory two-year term of imprisonment, the sentence for which would run consecutively to any other sentence imposed for the other counts of conviction. But unlike the second option outlined in AUSA Murphy's May 9 email, this plea proposal included a statement of facts in the body of the plea agreement implicating Weese, but not Kenneth Ziglar, in the scheme. Specifically, Pamela Ziglar stipulated that: (1) "Melody Weese . . . joined the conspiracy in an effort to assist Pamela Ziglar with obtaining money to which they were not entitled"; (2) Weese "benefitted financially from the scheme"; (3) Weese "jointly applied" with her parents for a business checking account at Carter Bank and Trust under the name Five Z's; (4) Weese, who was not an employee of Five Z's and had never performed any services for the company, received a $5,000 check; and (5) Weese advised her mother to write checks in amounts less than $10,000 to avoid "red flags." (*See* ECF No. 115.) At the time AUSA Murphy drafted this section, he had not proffered Ziglar about her daughter's involvement.[6] Essentially, the stipulation of facts—which AUSA Murphy drafted himself— was based on what Ziglar had initially told the agents during the April 29, 2021 interview, the various loan applications, the banking records, and inferences drawn from that evidence. The proposed plea agreement also contained a standard cooperation section, providing that Pamela would be eligible for a substantial assistance motion to reduce her sentence.

---

[6] A "proffer" refers to a formal debriefing of a cooperating witness or defendant that is provided under the terms of a plea agreement and/or a separate agreement limiting how incriminating statements can be used by the government. A cooperating witness undergoing a proffer is obligated to provide truthful information about her and others' involvement in criminal activity.

Pamela Ziglar signed this plea agreement on June 8, 2022, and the government filed it with the court. (*See* ECF No. 115.) The following day, the court conducted the final pretrial conference in Weese's case. This hearing addressed several motions *in limine*, including Weese's motion to exclude various statements made by her mother during the alleged conspiracy which, Weese predicted, the government would seek to introduce against her as statements of a co-conspirator. (*See* ECF No. 86.) According to Weese, these statements—including Ziglar's "pay" annotation on the memo line of the $5,000 check to her daughter and Ziglar's representation as part of a loan application that Weese was her "banker"—were not admissible under Federal Rule of Evidence 801(d)(2)(E), unless or until the government established, by a preponderance of the evidence, that Ziglar and Weese were, in fact, members of a conspiracy. In response to this argument, the government proffered evidence, relying in large part on Pamela Ziglar's signed plea agreement and statement of facts from the day before to argue that it had met its burden of establishing a conspiracy for purposes of 801(d)(2)(E). (*See* Final Pretrial Conference Tr. 10:17–11:4, June 9, 2022 [ECF No. 133] ("Final PTC Tr.").) After hearing argument from both parties, the court agreed with the government and ruled that the purported co-conspirator statements would be admissible if Pamela Ziglar testified as outlined in her plea agreement.[7] (*Id.* at 39:11–48:8.)

Four days later, on June 13, 2022, Pamela Ziglar appeared before the court to enter her guilty plea. Immediately prior to her plea hearing, Ziglar and her attorney met with AUSA Murphy and one of the agents to amend the statement of facts in her plea agreement. Ziglar

---

[7] The court, however, indicated that it might vacate this ruling if Pamela Ziglar did not testify at trial or provided testimony different from that outlined in her plea agreement. (*See* Final PTC Tr. 44:13–20; 51:25–53:2.)

amended two of the stipulations pertaining to her daughter. First, in paragraph 4(a), she substituted "moving" for "obtaining," so that the last sentence of that paragraph read: "Melody Weese . . . later joined the conspiracy in an effort to assist Pamela Ziglar with moving the funds to which they were not entitled." (*Compare* ECF No. 115, *with* ECF No. 139.) Second, Ziglar amended 4(e), the paragraph about opening the Five Z's checking account. Although the prior version had provided that Weese and her parents had "jointly applied" for the account, the revised version stipulated that Ziglar had applied for the checking account by herself and "used [her husband's and daughter's] names as cosigners in filling in the application." (*Compare* ECF No. 115, *with* ECF No. 139.) Other than the substantive changes to the plea agreement, there is no record—audio recording, memorandum of interview, or otherwise—of what Ziglar said during this meeting with the government. Immediately following this meeting, Ziglar appeared before the court and formally pleaded guilty. The government and Ziglar's counsel jointly filed the revised plea agreement at this hearing. (ECF No. 139.)

Following her change-of-plea hearing, Pamela Ziglar and her attorney met again with the agents and AUSA Murphy in a witness room—this time, for a formal proffer interview. The government recorded this interview, which is part of the record. (*See* ECF No. 154-7.) During Ziglar's proffer, she reiterated, contrary to the stipulation of facts in her June 8 plea agreement, that Weese had not jointly applied for the Carter Bank and Trust checking account and that Ziglar had opened the account on her own. And contrary to the stipulation in the revised plea agreement that Weese had "benefitted financially" after joining the conspiracy, Ziglar stated that her daughter had not retained the proceeds of the $5,000 check that her

mother had given her. Ziglar clarified that Weese had deposited the check, withdrawn the money, and returned the full amount in cash to her. (*See id.* at 12.) Ziglar added that, at the time Weese received and cashed the $5,000 check for her mother, she was not aware that the source of those funds was a COVID-19 paycheck protection loan. (*Id.* at 13.) Ziglar also stated that when she falsely represented on a loan application that Five Z's employed three individuals, she was referring to her husband, herself, and a third (male) individual who had occasionally done work for the company. (*Id.* at 5.) In other words, Ziglar clarified that this third employee was not Weese, contrary to what the plea agreement's statement of facts implies.

Two days after Ziglar's guilty plea, Weese's attorneys filed a motion to continue the trial, a request the government opposed. The court granted that motion. (ECF No. 152.) Several days later, Weese's attorneys also filed the instant motions based on the alleged prosecutorial misconduct of AUSA Murphy. The court held a hearing on the motions on August 5, and the matter is ripe for decision.

## II.   STANDARD OF REVIEW

District courts possess the inherent power to sanction prosecutors for misconduct, including for acts, errors, and omissions that do not violate a defendant's constitutional rights. *United States v. Hasting*, 461 U.S. 499, 505–06 (1983). But that inherent authority is circumscribed, and it is well-established that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct [that was] not prejudicial to the defendant . . . ." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988). Thus, when a defendant seeks dismissal of an indictment based on alleged prosecutorial misconduct, she must demonstrate

that "this misconduct prejudicially affected [her] substantial rights." *United States v. Kennedy,* 372 F.3d 686, 696 (4th Cir. 2004) (citing *United States v. Derrick*, 163 F.3d 799, 807–08 (4th Cir. 1998)); *see also* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance which does not affect substantial rights must be disregarded."). "Under this standard, dismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (cleaned up).

## III.   DISCUSSION

Weese contends that AUSA Murphy engaged in several acts that amounted to prosecutorial misconduct, and that the cumulative weight of this misconduct affected her substantial rights and justifies dismissal of the indictment. First, Weese argues that AUSA Murphy committed misconduct by accompanying government agents to the Ziglars' home in April 2021 and participating in the ensuing noncustodial interview. Second, she contends that AUSA Murphy engaged in unfair plea-bargaining tactics by offering her and her parents wired pleas and, when those were refused, leveraging Pamela Ziglar's resulting animus towards her daughter to convince her to sign a separate plea agreement falsely implicating Weese in the conspiracy. Third, Weese claims that AUSA Murphy failed to make required disclosures of exculpatory and impeachment information related to Ziglar's plea agreement and post-plea statements to investigators. Finally, Weese argues that AUSA Murphy did not satisfy his duty of candor by failing to alert the court that Ziglar had recanted—or at least substantially watered down—key stipulations of fact implicating her daughter in the conspiracy in her plea

agreement. To the extent that the court had relied on those stipulations of fact in ruling that purported co-conspirator statements would be admissible at trial, Weese argues that AUSA Murphy should have promptly advised the court that this assumption was no longer valid. The court will address each allegation of prosecutorial misconduct in turn.

## A. AUSA Murphy's Participation in the Ziglars' Pre-indictment Interview

Weese first argues that AUSA Murphy violated the rules of professional conduct by failing to disclose to the Ziglars, at the outset of the interview, that they were targets of his investigation, thereby duping these "unwary grand jury targets into incriminating themselves (in their home) before disclosing to them his true purpose in questioning them." (ECF No. 178, at 3–4.)

As a threshold matter, Weese concedes that the interview itself did not violate the Fifth Amendment rights of any party, nor could she credibly make such a claim. It is undisputed that: (1) the Ziglars invited the agents and AUSA Murphy into their home; (2) the agents told the Ziglars that they were not under arrest; (3) the Ziglars expressly consented to speaking with the investigators and having the conversation audio recorded; and (4) neither the agents (nor AUSA Murphy) engaged in any hostile, threatening, or coercive conduct at any point. Weese also does not dispute that, to the extent the two government agents made any material misrepresentations about their role or intentions, those deceptions do not violate the Constitution. *See United States v. Whitfield*, 695 F.3d 288, 302 (4th Cir. 2012) (noting that "'misrepresentations are insufficient, in and of themselves, to render a confession involuntary'" (quoting *Johnson v. Pollard*, 559 F.3d 746, 755 (7th Cir. 2009)); *see also United States v. Braxton*, 112 F.3d 777, 781–83 (4th Cir. 1997) (reversing suppression of a defendant's

statement after investigators falsely assured him that he would not be prosecuted if he came "clean"). And because Weese was not present during the interview, she does not have standing to assert any constitutional violation. *See, e.g.*, *Barrows v. Jackson*, 346 U.S. 249, 255 (1953) ("Ordinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party."). *Cf. United States v. Dyess*, 478 F. 3d 224, 236 (4th Cir. 2007) (holding that dismissal of an indictment was not an appropriate remedy for an investigating officer inducing a co-defendant to commit perjury at the defendant's sentencing hearing).

Instead, Weese argues that, because AUSA Murphy elected to participate in this alleged subterfuge, he committed sanctionable prosecutorial misconduct against her co-defendant parents, which ultimately resulted in her indictment. Weese initially took issue with AUSA Murphy's involvement in the April 29 interview early in these proceedings, and she has reiterated those concerns in multiple filings. (*See* ECF Nos. 86, 136, 154, 167 & 182.) Specifically, Weese contends that, by not explaining his status as a "criminal prosecutor" at the outset of the interview and advising the Ziglars that they were the "targets" of his investigation, AUSA Murphy "deliberately helped create the false impression that this was a friendly information gathering session while in fact he and the agents were there to do what the agent [later] disclaimed—'to jam up' the Ziglars and Mrs. Weese." (ECF No. 178, at 2.) Weese alleges that AUSA Murphy took other actions to perpetuate this ruse, including by feigning interest in purchasing an old pickup truck from the Ziglars, stating and reiterating that he was just trying to understand the Ziglars' business, thanking them for their "helpful" explanations, and otherwise participating in jovial banter about not being "good" with numbers and staying for dinner. (*See, e.g.*, ECF No. 167, at 13.)

But Weese has struggled to articulate a consistent rationale or legal basis as to why AUSA Murphy's presence and statements during what she concedes was an otherwise voluntary, noncustodial (and therefore constitutional) interview amounts to prosecutorial misconduct. The court has found no support for the argument that a prosecutor cannot participate in an investigative interview of individuals that he considers targets of a grand-jury investigation without advising them of their target status. Indeed, the term "target" itself is merely U.S. Department of Justice parlance for "a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." Justice Manual ("JM") § 9-11.151.[8] Being a target of a DOJ investigation "neither enlarges nor diminishes [the] constitutional protection against compelled self-incrimination," and so "potential defendant warnings add nothing of value to protection of Fifth Amendment rights." *United States v. Washington*, 431 U.S. 181, 189 (1977). In other words, there is no constitutional right to target warnings. *See United States v. Myers*, 123 F.3d 350, 354–55 (6th Cir. 1997); *United States v. Burke*, 781 F.2d 1234, 1245 (7th Cir. 1985). It logically follows, then, that there is no constitutional right in someone *else* receiving a target warning.

But while there is no constitutional right to target warnings, DOJ policy prohibits prosecutors from subpoenaing a target to appear before a federal grand jury unless they have express permission from a high-ranking Department official, usually a U.S. Attorney or an Assistant Attorney General. If a target appears before a grand jury—either voluntarily or

---

[8] "The Justice Manual contains publicly available Department of Justice (DOJ) policies and procedures." JM § 1-1.100. It can be found online at www.justice.gov/jm/justice-manual.

pursuant to a subpoena—prosecutors are required to advise that individual of her Fifth and Sixth Amendment rights at the outset of her testimony. *See* JM § 9-11.151. But DOJ does not prohibit prosecutors from conducting target interviews outside of the grand jury context. Since AUSA Murphy did not question the Ziglars before the grand jury (or otherwise in a custodial setting), he was not obligated—by the Constitution, statute, or DOJ policy—to advise them of their target status or their constitutional rights at the outset of the interview.

Apparently recognizing the soft ground on which she stands, Weese has settled on the Virginia Rules of Professional Conduct[9]—specifically Rule 4.3(a)—to argue that AUSA Murphy's actions constitute prosecutorial misconduct. (ECF No. 178, at 2–4.) Rule 4.3(a) provides that, "In dealing on behalf of a client with a person who is not represented by counsel, a lawyer should not state or imply that the lawyer is disinterested." The rule further states that "[w]hen the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct that misunderstanding." Va. R. Prof. C. 4.3(a).

Weese first argues that AUSA Murphy violated Rule 4.3(a) by failing to inform the Ziglars *at the outset of the interview* that he was a criminal prosecutor and that they were the targets of his investigation. Weese says that by failing to do so at the beginning—and, later, by engaging in friendly banter and in stating that he wanted "to understand the business"— AUSA Murphy "duped" the Ziglars into participating and continuing in the interview. But

---

[9] The Virginia Rules of Professional Conduct can be accessed online at https://www.vsb.org/pro-guidelines/index.php/rules.

Weese fails to specify how the Ziglars were duped, and the argument that they were is belied by the circumstances of the interview itself.

As noted above, AUSA Murphy was accompanied by two special agents from the FDIC-OIG, both of whom presented badges and credentials to the Ziglars. A uniformed local sheriff's deputy was also present throughout the interview. SA Serra further advised the Ziglars at the outset of the interview that "no one is under arrest," implying that they had the authority to make an arrest. Moreover, the agents asked for and received their permission to record the interview. Given all of this, it strains credulity to suggest that the Ziglars misunderstood that these law enforcement officials, including AUSA Murphy, were interviewing them about a serious (and potentially criminal) matter, let alone that AUSA Murphy was obligated, under Rule 4.3(a), to correct any perceived, but unreasonable, misunderstanding about that investigation and his role in it.

But this does not end the inquiry. Weese also contends SA Serra's statement to Pamela Ziglar that investigators were not "trying to jam [Melody] up" was materially misleading, in that it implied to Ziglar, who eventually expressed reluctance about getting her daughter in "trouble," that investigators were not interested in pursuing criminal charges against her. At the hearing on Weese's motion to dismiss the indictment, AUSA Murphy conceded that SA Serra's statement could reasonably be understood as implying as much and, at least in that respect, it was misleading. (ECF No. 185, at 65:14–21.)

But AUSA Murphy represented that, at the time SA Serra uttered it, the statement did not register with him in that way, let alone trigger any concern that he might be ethically obligated to correct it:

> Judge, very candidly as I stand before you, you know, I'm in this living room. There are five people in there. There is a baby going on. I can't say as I sit here that I even remember him saying that, "We're not here to jam her up." . . . But so, Your Honor, certainly caution -- assuming that I had heard that and it triggered at my -- you know, at that time caution would certainly -- or -- I should have so advised.

(*Id.* at 65:9–12; 66:13–16.) Accepting AUSA Murphy's representation as true—and considering that the agent's single misleading remark did not pertain directly to AUSA Murphy or his role in the matter—the court concludes that AUSA Murphy did not violate Rule 4.3(a) by failing to correct any misunderstanding that might have arisen as a result, because he did not "state or imply that [he w]as disinterested" and did not "know [n]or reasonably should [have] know[n]" that the Ziglars misunderstood his role in the matter. In sum, the court concludes that AUSA Murphy did not engage in prosecutorial misconduct during the April 29, 2021 interview.[10]

Even if the court concluded that AUSA Murphy had violated Rule 4.3(a) by failing to correct SA Serra regarding their intention with respect to Weese, the court would be constrained to conclude that this failure did not affect Weese's substantial rights. SA Serra made his allegedly misleading remark about not "trying to jam [Melody] up" *after* Pamela Ziglar had informed the agents that her daughter had advised her to break up the $15,000 deposit to avoid "red flags" at the bank. (*Compare* Home Tr. at 45–46, *with id.* at 58.) In other words,

---

[10] This case illustrates the potential pitfalls that may arise when federal prosecutors accompany agents to conduct target interviews. In addition to running afoul of various ethical rules that do not apply to non-attorney investigators, AUSAs who participate in these types of interviews risk becoming witnesses and, as a result, conflicting themselves out of their cases. AUSA Murphy should be more mindful of this in the future.

Pamela Ziglar's incriminating—and potentially prejudicial—statement was not elicited by the agent's assurance and/or AUSA Murphy's failure to correct it.

### B. "Unfair" Plea Bargaining Tactics

Weese next contends that AUSA Murphy committed prosecutorial misconduct through his plea-bargaining efforts. Central to this allegation is Weese's assertion that AUSA Murphy violated his duty of negotiating in good faith by attempting to resolve the case against the Ziglars and Weese through wired plea agreements. This argument is unpersuasive.

The use of wired plea agreements is well-established, and every circuit that has examined this practice, including the Fourth Circuit, has upheld it. *See, e.g., United States v. Pollard*, 959 F.2d 1011, 1021–22 (D.C. Cir. 1992) (collecting cases). "[A] guilty plea made to obtain lenient treatment for a third party is not invalid as long as it is otherwise shown to be voluntary." *United States v. Lemery*, No. 93-5055, 1993 WL 265040, at *2 (4th Cir. July 19, 1993) (per curiam) (unpublished). To be sure, the practice requires the government to display "a high standard of good faith." *Harmon v. Mohn*, 683 F.2d 834, 838 (4th Cir. 1982). This is because wired pleas, by their nature, might be coercive, and, as one court in this district recently recognized, this concern is amplified when the defendants are family members. *United States v. Blankenship*, No. 1:19cr000003-003, 2020 WL 734484, at *3 (W.D. Va. Feb. 13, 2020) (Jones, J.).

"To say that a practice is 'coercive' or renders a plea 'involuntary' means only that it creates improper pressure that would be likely to overbear the will of some innocent persons and cause them to plead guilty." *Pollard*, 959 F.2d at 1021. That is simply not a concern in this case. As discussed above, Weese, who has consistently maintained her innocence, expressly

rejected the wired pleas offered to her by the government. Had Weese accepted the wired plea, the court would have pressed her to ensure that she was doing so voluntarily and not out of concern that her parents would potentially be subjected to a longer prison term if she had refused it. But Weese rejected the wired pleas and has elected to go to trial; she has not been coerced to do anything.

The Fourth Circuit has highlighted two additional scenarios when the use of wired pleas might be coercive. First, the government may not promise to drop charges against a third party who it lacks probable cause to charge in the first instance. *See United States v. Lundy*, 601 F. App'x 219, 223 (4th Cir. 2015) (per curiam). This did not happen here, as the grand jury returned an indictment charging both Weese and her parents, and the grand jury's indictment conclusively established probable cause to charge them both. *See Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975) (noting that "an indictment, fair upon its face, returned by a properly constituted grand jury, conclusively determines the existence of probable cause") (cleaned up).

Second, the court should not accept a wired plea if it is apparent that the defendant is being pressured by other defendants to sign it. *Lundy*, 601 F. App'x at 223. Again, Weese expressly rejected the wired plea agreement offered to her, so there is no concern that she waived important constitutional rights as the result of undue pressure from her co-defendants.

Perhaps recognizing all of this, Weese offers an additional argument as to why AUSA Murphy's plea-bargaining tactics were improper. According to Weese, once she rejected the government's last offer of a wired plea—which would have resulted in more favorable terms

for her parents[11]— and indicated that she intended to proceed to trial, AUSA Murphy "zeroed in on [Weese]—the person who kept Pam Ziglar's husband in the case and ruined the favorable deal offered to Ms. Ziglar." (ECF No. 166, at 17.) AUSA Murphy first offered a two-party wired plea to the Ziglars containing factual stipulations that Weese was involved in the conspiracy. When that proposal was refused, Weese claims AUSA Murphy "continued to focus on Ms. Weese and leveraging his power over Ms. Ziglar." (Id. at 18.) He did so by offering her an "unwired" plea under which she would plead guilty to the conspiracy counts and the identity-theft count carrying the mandatory penalty. Under the terms of this agreement, Pamela Ziglar could potentially earn a substantial assistance motion for her cooperation against her daughter. "And, importantly, it specified what she needed to do to earn such—agree to the stipulation of facts in the plea agreement which tied Melody to the conspiracy and testify to this." (ECF No. 167, at 18.) Weese adds that AUSA Murphy drafted the statement of facts in the plea agreement himself, implying that, in so doing, he knowingly outlined a false narrative about Weese, which Ziglar, who was angry at her daughter for refusing the earlier wired plea, adopted in the hopes of receiving a reduced sentence.

This alternative argument collapses under its own weight. Nothing about AUSA Murphy's plea-bargaining tactics after Weese rejected her last wired proposal was improper. Despite Weese's arguments to the contrary, it was entirely appropriate for the government to have "zeroed in" on Weese after she rejected the final plea proposal and indicated that she

---

[11] Under the terms of the final three-party wired plea proposal, Weese would have faced a potential term of 0–6 months; Pamela Ziglar would have pleaded guilty to the conspiracy counts, but not the identity-theft charge carrying the mandatory term of two years, and faced 0–33 months; and Kenneth Ziglar would have been dismissed from the case.

wanted to go to trial. Indeed, once the court had determined that Weese's trial would proceed first, the government faced the daunting prospect of proving a conspiracy without having testimony from anyone involved in that alleged conspiracy. Given Pamela Ziglar's integral role in planning and executing the conspiracy (as she has admitted), the strength of the evidence against her, and her prior intimations through counsel that she was willing to plead guilty, securing a plea agreement requiring Ziglar's cooperation against her daughter was a logical next step. Although Weese's counsel has described the government's decision to negotiate a plea deal requiring a mother to testify against her daughter as unprecedented and unconscionable, neither characterization is correct (or justified). Indeed, in cases involving conspiracies and other alleged criminal activities perpetrated by members of the same family, it is commonplace for prosecutors to call family members to testify against other family members. Nothing about the practice is *per se* improper, no matter how rare it may be in counsel's experience, and AUSA Murphy's decision to adopt it in this case was appropriate under the circumstances.

Weese is also wrong to suggest that AUSA Murphy engaged in prosecutorial misconduct by drafting the statement of facts for Ziglar's first plea agreement and in implying that he took advantage of some perceived animus between mother and daughter to inveigle Ziglar to adopt a false narrative about Weese's alleged role. It is well-established that federal prosecutors may draft proposed statements of fact for their plea agreements. *See United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016); *United States v. Fell*, 531 F.3d 197, 216–21 (2d Cir. 2008); *United States v. Carver*, 179 F. App'x 276, 278 (6th Cir. 2006). Indeed, given their roles and proximity to the larger body of evidence, they routinely do so. AUSA Murphy drafted the

proposed statement of facts in this case based, in large part, on Ziglar's statements about her daughter's banking advice during the April 29, 2021 interview, the cancelled $5,000 "pay" check, and her statement on a fraudulent loan-application describing Weese as her "banker." Based on this evidence and valid inferences drawn from it, it was therefore reasonable for AUSA Murphy to assert: "Melody Weese, Pamela's daughter, later joined the conspiracy in an effort to assist Pamela Ziglar with obtaining money to which they were not entitled. Melody Weese benefitted financially once joining the scheme . . . ." (ECF No. 115.) AUSA Murphy transmitted the proposed plea with that language to Ziglar's counsel, an experienced defense attorney, for his and Ziglar's review and signatures. Ziglar and her attorney both signed that agreement, presumably after reviewing it carefully, and returned it to AUSA Murphy, who filed it with the court. Although Ziglar later "corrected" certain key assertions about her daughter in the plea agreement—indicating that Weese had no knowledge about the source of the money and had not benefited financially— AUSA Murphy cannot be faulted for drafting the original stipulation based on the evidence available to him and on signed assurances from Ziglar and her counsel that this stipulation was accurate.[12] And the suggestion that AUSA Murphy somehow capitalized on any perceived animus to induce Ziglar to adopt a false narrative about her daughter is not only unfounded, but it is belied by the fact that Ziglar largely undercut that very narrative five days after signing her original plea agreement.

---

[12] As the court noted during the August 5 hearing, AUSA Murphy can be faulted for failing to proffer Pamela Ziglar before drafting and having her sign the statement of facts. Given the nature of the conspiracy and the complicated family dynamics at play, the government should have engaged in a more searching factual inquiry with this witness before resolving her guilty plea—particularly since it was and is critical for the government's case against Weese—but its failure to do so is not prosecutorial misconduct.

In sum, the court concludes that AUSA Murphy did not commit prosecutorial misconduct in connection with his plea negotiations in this case. But assuming for the sake of argument that he did, that alleged misconduct, which occurred months after the grand jury's decision to indict, "could not have affected the charging decision" and therefore would not justify dismissal of the indictment. *Bank of Nova Scotia*, 487 U.S. at 259–60.

### C. Alleged *Brady/Giglio* Violation

Next, Weese asserts that the government has not fulfilled its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), because AUSA Murphy failed to disclose information that Weese contends is exculpatory or could be used to impeach Pamela Ziglar at trial. Weese specifically alleges that AUSA Murphy did not provide a copy of a May 12, 2022 email response from himself to Pamela Ziglar's attorney outlining the terms of a possible plea agreement (*see* ECF Nos. 136-3 & 154-5) and failed to record— or otherwise memorialize—the government's June 13, 2022 meeting with Ziglar and her attorney, during which she revised, or "redlined," her original statement of facts.

To establish a *Brady* violation, a defendant must show that the evidence at issue is: "(1) favorable to the defendant," either because it is exculpatory (that is, it tends to negate her guilt) or impeaches the credibility of a prosecution witness; "(2) material to the defense" (that is, some prejudice resulted from its nondisclosure); and "(3) suppressed (that is, within the prosecution's possession but not disclosed to the defendant)." *United States v. Young*, 916 F.3d 368, 383 (4th Cir. 2019). With respect to the third element, a *Brady* violation does not occur "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked . . . ." *United States v. Wilson*, 901 F.2d

378, 381 (4th Cir. 1990). Although *Giglio*—or impeachment—information, which essentially is a subcategory of *Brady*, can take many forms, plea agreements, criminal records, grants of leniency or immunity, and prior statements are paradigmatic. The government is generally obligated to disclose *Giglio* information in time for a defendant to make effective use of it at trial or sentencing. *See United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009).

Weese argues that AUSA Murphy improperly withheld his May 9, 2022 email response to Ziglar's attorney about the contours of a potential plea agreement when the government produced an initial batch of emails between AUSA Murphy and Ziglar's attorney. In this email, AUSA Murphy was responding to defense counsel's proposal whereby Ziglar would be allowed to plead guilty to certain charges without having to implicate her husband or daughter in the conspiracy. In rejecting this proposal, AUSA Murphy responded that, "to gain the benefit of a plea agreement that limits her own punitive exposure, [Pamela Ziglar] has to do *something* for the government . . . ." (ECF No. 154-5.) AUSA Murphy then outlined two possible options that might be acceptable to the government: (1) Pamela pleading guilty to a conspiracy involving her husband and daughter and stipulating to their involvement; or (2) Pamela "admits to having done this entirely on her own with no knowledge on the part of her husband and daughter[,]" in which case she pleads to the conspiracy and an additional charge of aggravated identity theft count, carrying a mandatory two-year prison term. (*Id.*) As the government points out, neither of these options was acceptable to Pamela Ziglar, who pleaded guilty a month later to slightly different terms.

Even assuming that AUSA Murphy's May 9 email to Ziglar's counsel constitutes *Giglio* material,[13] Weese has not established an actionable violation of the rule for two reasons. First, Weese's attorneys already possessed the email at issue because Ziglar's counsel had shared it with them on May 9, or the day AUSA Murphy initially sent it to him. In other words, the email was not suppressed.[14] Second, because trial has not yet occurred and Weese will have ample opportunity to make use of the email at that trial (if permitted by the rules of evidence), she has not suffered any prejudice.

---

[13] The parties dispute as a threshold matter whether this email even constitutes *Giglio* material. Weese argues that AUSA Murphy's May 9 email to Ziglar's attorney constitutes impeachment information because it reflects potential inducement (that is, "to gain the benefit of a plea agreement that limits her own punitive exposure") to testify against her daughter. The government argues that, as a general matter, email and other communications between a prosecutor and a defense attorney about the *possible* terms of a plea agreement are not *Giglio* information. This is because a cooperating witness's motive to testify—and potentially to fabricate her testimony—is triggered by the existence of the plea agreement itself, not the discussions between lawyers that may result in a plea agreement. To the extent the negotiations do not yield an agreement, the negotiations themselves do not implicate that defendant's credibility. "The witness's credibility is impacted by the existence of a plea agreement, not the machinations of counsel that precede the formation of the agreement." (ECF No. 162, at 28.) Accordingly, the government argues that routine emails between it and defense counsel are not *Giglio* information and they were not obligated to turn the May 9 email over to Weese's counsel (even though they intended to do so, out of an abundance of caution).

The government's argument is logical. The May 9 email did not in fact result in a plea agreement under the terms discussed in the email or otherwise contain any promises, inducements, assurances, or threats by the government that were not reflected in the plea agreement ultimately signed on June 8. That agreement provided that Pamela Ziglar would plead guilty to the conspiracy and aggravated identity theft charges and cooperate in the case against her daughter in exchange for the government's standard promise to consider her for a substantial assistance motion based on that cooperation. In that respect, it reflects AUSA Murphy's sentiment that both parties needed to benefit from the bargain. This sentiment is hardly novel, and it is routinely reflected in plea agreements containing a cooperation provision.

The court can, however, imagine a scenario whereby a misguided prosecutor makes certain assurances to a defense attorney about a potential benefit or favorable disposition for the defendant, but those assurances are not specifically outlined in the plea agreement. Under those circumstances, the prosecutor's email certainly would constitute *Giglio* material. Similarly, if an attorney emails a prosecutor about her client's animus for or resentment towards the defendant or his expectation that he will receive a particular benefit or outcome in exchange for his testimony, that would also constitute *Giglio* material.

In any event, the court need not resolve this interesting issue because, for the reasons discussed herein, Weese's *Giglio* claim fails on independent grounds.

[14] Weese's attorneys claim that AUSA Murphy's initial non-disclosure of this email was intentional and not due to a "sorting error," as the government maintains. Finding Weese's evidence—which is pure supposition— unconvincing, the court accepts AUSA Murphy's explanation.

Weese also argues that the government violated *Brady/Giglio* by failing to memorialize—by audio recording, memorandum of interview, or otherwise—its meeting with Pamela Ziglar immediately prior to Ziglar's June 13 plea hearing. During this meeting, Ziglar and her counsel directed the government to modify several paragraphs in the original statement of facts discussing Ziglar's role in the conspiracy, and the government acquiesced. Ziglar apparently also changed two paragraphs involving her daughter's role. In paragraph 4(a), Ziglar clarified that Weese had joined the conspiracy to assist her mother with "moving money to which they were not entitled," rather than assisting her mother with "obtaining" money. (*Compare* ECF No. 115, *with* ECF No. 139.) Second, in paragraph 4(e), Ziglar clarified that she had applied for the Five Z's business checking account and had used her husband and daughter's names "as co-signors" on the application. (ECF No. 139.) In the original paragraph, the government had written that the Ziglars and Melody had "jointly applied" for this checking account. (ECF No. 115.) According to Weese, the government's failure to record Ziglar's statements while she made these changes to her plea agreement amounts to a *Brady* violation.

The court is not convinced. It is undisputed that the modifications, which were initiated by Ziglar's attorney and based on notes that he brought to the meeting, occurred in a hurried fashion shortly before the hearing began. (*See* Hr'g Tr. 81:2–84:24, Aug. 5, 2022 [ECF No. 185].) Ziglar and her attorney dictated the requested changes, which mainly related to her involvement in the conspiracy, to SA Serra, who incorporated them into the document with his laptop computer. Two of these changes pertained to Melody Weese, and the modifications to paragraphs 4(a) and 4(e) were favorable to her. But in terms of exculpatory and

impeachment value, the modifications to the plea agreement speak for themselves. Simply comparing the June 8 version to the revised June 9 version conclusively establishes that (1) Ziglar now takes sole responsibility for opening the checking account and (2) Ziglar has provided (at least) two different versions of how this came about. Moreover, immediately following her Rule 11 hearing, Ziglar was proffered by the government about this revised statement of facts, including these assertions about opening the bank account and Weese's knowledge of the origin of the funds in it. During this interview, which was audio recorded, Ziglar reiterated the assertions contained in the revised document and provided additional exculpatory information about her daughter's role (or lack thereof). In sum, the record is replete with exculpatory and impeachment evidence on this score, and it is speculative to suggest that, had the pre-plea meeting also been recorded, it would have yielded anything new. The court will therefore deny the motion to dismiss the indictment for a *Brady*/*Giglio* violation.[15]

### D. Alleged Lack of Candor to the Court

Finally, Weese contends that AUSA Murphy has failed to satisfy his duty of candor to the court. Attorneys practicing before this court must adhere to the Virginia Rules of Professional Conduct, including Rule 3.3, which provides, among other things, that a lawyer shall not knowingly make a false statement of fact or law to the tribunal, or fail to disclose certain facts or controlling law. *See Loc. Fed. R. of Disciplinary Enf't* IV(B) ("Acts or omissions by an attorney admitted to practice before this Court . . . which violate the Code of

---

[15] Finding that no violation has occurred, the court will decline to take any other remedial steps, like removing AUSA Murphy from the case or having a magistrate judge oversee the government's *Brady*/*Giglio* disclosure disclosures going forward.

Professional Responsibility or Rule of Professional Conduct adopted by this Court shall constitute misconduct and be grounds for discipline . . . .") Weese contends that AUSA Murphy's characterization of Pamela Ziglar's modification to her plea agreement in the government's response brief is a misleading statement of fact. She also argues that AUSA Murphy failed to disclose that Ziglar had recanted several of the assertions in her original plea agreement—assertions that this court had relied upon in ruling at the June 9 final pretrial conference that Ziglar's purported co-conspirator statements were admissible under Federal Rule of Evidence 801(d)(2)(E).

Having carefully reviewed the record, the court finds that AUSA Murphy did not violate his duty of candor to this tribunal in either respect. Weese argues that AUSA Murphy's description of Ziglar's modification of paragraph 4(e) was misleading, insofar as the prosecutor, in describing the modification, explained that Ziglar removed language that indicated that Melody Weese "was present when the [bank] application was submitted." (ECF No. 162, at 15.) According to Weese, that characterization is misleading because it implies that the first stipulation had only asserted that Weese was present when the account was opened, rather than what it actually stated: that the defendants had "jointly applied" for the account. But Weese's argument fails to account for the very next line in the government's brief. In that sentence, the government noted that Ziglar had explained that she had added her daughter and husband to the bank account as "authorized signers," implying that Ziglar had opened the account on her own. Although one could argue that that the government could have been

more precise in paraphrasing this alteration, the court finds that, read in context, it is not materially misleading, and the court was never so mislead.[16]

The court also concludes that AUSA Murphy did not violate Rule 3.3 by failing to advise the court that Ziglar had recanted several key assertions during her post-plea proffer. The court relied on those assertions in ruling on the admissibility of the co-conspirator statements on June 9, and AUSA Murphy arguably should have informed the court of this development as soon as it occurred. Indeed, he easily could have filed a short notice summarizing the substance of Ziglar's proffer so that the court could determine, on its own initiative, whether it needed to reopen that hearing or revisit its prior ruling. At that point, trial was less than two weeks away, and the court's recent 801(d)(2)(E) ruling was of central importance to both parties. But the court does not find that AUSA Murphy's failure to file a timely notice about Ziglar's proffer amounts to a breach of his duty of candor (or prosecutorial misconduct), given that he disclosed the audio recording of the proffer to defense counsel approximately one day after the interview. In any event, Weese has not suffered any prejudice as a result, because her mother's statements were timely disclosed, the trial was continued, and the court has vacated its prior ruling with respect to the admissibility of any purported co-conspirator statements.

## IV.   CONCLUSION

In sum, the court concludes that AUSA Murphy has not committed prosecutorial misconduct in this case and that, even if his actions could be characterized as such, Melody

---

[16] Moreover, at the time the government filed its brief, the recording of Ziglar's proffer was already part of the record, undermining the suggestion that any purported mischaracterization was intentional.

Weese was not prejudiced as a result. With the exception of the April 29, 2021 interview, all of the alleged misconduct at issue post-dated indictment and therefore "could not have affected the charging decision."[17] *Bank of Nova Scotia*, 487 U.S. at 259–60. Therefore, dismissal of the indictment would not be an appropriate remedy even if the court had concluded that AUSA Murphy had engaged in misconduct.

At the hearing on Weese's motion to dismiss, her lead counsel vehemently argued that his client is innocent. While that sentiment is understandable given recent developments in the case, it does not necessarily follow that the government has engaged in prosecutorial misconduct. Indeed, based on its careful inspection of the record, the court concludes that it has not. Contrary to the defendant's argument, AUSA Murphy's actions in this case bear no resemblance to those of the rogue prosecutors in the cases Weese's counsel cited: *United States v. Golding*, 168 F.3d 700, 701–03 (4th Cir. 1999) (prosecutor threatening the wife of defendant that, if she testified in her husband's defense, she would be prosecuted federally for narcotics possession); *United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982) (prosecutor placing an "eleventh hour call to [the defendant's] attorney suggesting that she would be well-advised to remember the Fifth Amendment"); *United States v. Morrison*, 535 F.2d 223, 225 (3rd Cir. 1976) (prosecutor threatening potential defense witness with prosecution if she testified); and *United States v. Linder*, No. 12 CR 22, 2013 WL 812382, at *43 (N.D. Ill. March 5, 2013) (prosecutor ordering witnesses not to speak with defense counsel and collecting cases). They

---

[17] As noted above, even if the court concluded that AUSA Murphy had violated Rule 4.3(a) by failing to correct SA Serra when he indicated to Pamela Ziglar that the government was not trying to "jam up" Weese, this failure did not affect Weese's substantial rights. SA Serra made his remark *after* Pamela Ziglar had informed the agents that her daughter had advised her to break up the $15,000 deposit to avoid "red flags" at the bank. In other words, SA Serra's assurance did not elicit the arguably incriminating statement.

don't even come close. At bottom, the defense counsels' outrage at AUSA Murphy is simply not commensurate with the perceived, but ultimately unfounded, prosecutorial misconduct.

For the reasons explained above, the court will deny Weese's motions, and this matter will proceed to trial.

The clerk is directed to forward copies of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 18th day of August, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE